**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:

BIRAKOYE NASSOKO,

                      Debtor.

------------------------------------------------------------------x

Chapter 7

Case No. 07-11966 (ALG)

## MEMORANDUM OF OPINION AND ORDER

A P P E A R A N C E S:

RICHARD D. LAMBORN, ESQ.
Counsel for the Debtor
333 East 149th Street, 2nd Floor
Bronx, New York 10451

FORMAN HOLT ELIADES & RAVIN LLC
Counsel for E-Loan, Inc.
  By:  Joseph M. Cerra, Esq.
        Kimberly J. Solomon, Esq.
888 7th Avenue, Suite 4500
New York, New York 10106

MILLER & WRUBEL, PC
Counsel for Capex Acquisitions, LLC and Flatiron
 Financial Services, Inc., d/b/a/ Peak5
  By:  Charles R. Jacob III, Esq.
        Jeremy M. Sher, Esq.
250 Park Avenue
New York, New York 10177

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

       Before the Court is a motion filed by the Debtor seeking a finding of civil

contempt, damages, sanctions, and attorney's fees against E-Loan, Inc. ("E-Loan"),

Capex Acquisitions, LLC ("Capex"), and Flatiron Financial Services, Inc., d/b/a/ Peak5

("Peak5", and together with E-Loan and Capex, the "Respondents"), for an alleged

violation of the discharge order entered in the Debtor's Chapter 7 case. The Respondents ask the Court to dismiss the Motion. For the reasons set forth below, the Respondents' application is denied and the matter is set down for an evidentiary hearing.

## BACKGROUND

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on June 26, 2007 (the "Petition Date"). Prior to the Petition Date, E-Loan apparently extended a loan to the Debtor for the purchase of an automobile. E-Loan was listed as an unsecured non-priority creditor on Schedule F of the Debtor's Schedules of Assets and Liabilities, with a claim in the amount of $6, 415.13. (ECF Doc. # 1.) E-Loan was also included on the Debtor's mailing matrix. (See id.)

Thereafter, E-Loan sent a Notice of Default, dated June 28, 2007, to the Debtor, demanding that the Debtor place a lien on the vehicle in favor of E-Loan. The Notice stated that if the Debtor failed to do so, payment of the loan would be required in full. Counsel to the Debtor responded by letter dated July 9, 2007, stating that the Debtor had filed for bankruptcy protection, identifying the case number and the Petition Date, and noting that E-Loan was included on the Debtor's Schedules and mailing matrix.

Subsequently, an order of discharge, dated December 12, 2007, was entered on the docket with the filing treated as a "no asset" case (the filing of creditors' claims was not required). (ECF Doc. # 20.) The discharge order was served on creditors, and the accompanying certificate of service listed E-Loan as one of the parties that was served with notice of the discharge. (See id.) The form order stated that the collection of most prepetition debts was barred by the order.

2

Subsequent to entry of the discharge, the Chapter 7 trustee sent a letter to the Clerk indicating that there appeared to be assets available for distribution in the case and requesting that a bar date be set. (Docket # 21.) A Notice of Possible Payment of Dividends and of Last Date to File Claims was entered on the docket (Docket # 22) and served on E-Loan. (Docket # 23.) Thereafter, the Chapter 7 trustee filed a Notice of Sale to Debtor of Right, Title and Interest of Estate in 2002 Nissan (Docket # 24), stating that the Debtor had proposed to purchase the vehicle from the Trustee for $5,400, which was said to be the non-exempt equity in the automobile, and that interested parties had until May 2, 2008 to object to the proposed sale. It does not appear from the docket that any party objected, and the sale was consummated.

On April 22, 2008, while the proposed sale was pending, the Debtor received an email from E-Loan, stating that it appeared that the automobile in question did not have E-Loan listed as a lienholder and that this must be corrected. The email further stated that if the matter had already been addressed, the Debtor should fax a "copy of his registration, title or a receipt showing that E-Loan's lien has been placed." (See Aff. of Debtor's Atty., Ex. E.) Thereafter, Debtor's counsel moved for a finding of civil contempt and for damages, sanctions and attorney's fee against E-Loan, Inc. and two of its employees for violation of the automatic stay in the bankruptcy case.[1] Prior to the hearing date, E-Loan settled with the Debtor and received a General Release, dated July 8, 2008 (the "Release"), in exchange for a $4,000.00 payment to the Debtor.[2]

---

[1] The Debtor's motion was based on violation of the automatic stay despite the fact that the discharge order had already been entered.

[2] The Debtor released the parties from any causes of action he had or could have brought prior to the date of the Release. Additionally, the Release acknowledged that the settlement did not constitute "an admission of guilt, liability, wrongdoing, or neglect on the part of E-Loan [and its employees] . . . " (See Aff. of Debtor's Atty., Ex. F.)

3

The Trustee's final report in the case was filed on August 5, 2008 (ECF Doc. # 30). The report shows that unsecured creditors were entitled to receive a 14.3% dividend, but it does not appear that E-Loan ever filed a proof of claim, and it is not listed on the report as a potential distributee. As noted above, the order of discharge had been entered on December 12, 2007.

On or about December 30, 2008, E-Loan transferred the Debtor's "loan" (along with many others in a portfolio) to Capex pursuant to a Purchase and Sale Agreement (the "Portfolio Purchase Agreement") (See Certification of Michael Miller, ¶ 3.) Earlier that month, the Debtor had received a letter from Peak5, dated December 5, 2008, which referenced the Debtor's E-Loan account number, claimed that the "loan" had been sold to Capex and asserted that Peak5 had been retained to service "repayment" of the "loan."[3] The letter stated that beginning December 1, 2008, the Debtor would receive a monthly auto loan statement from Peak5 and that "[i]f you do not receive an auto loan statement from Peak5 by your next due date after December 1, 2008, please mail your payment to the following address . . . ." (See Aff. of Debtor's Atty., Ex. J.) It also provided the Debtor with directions for several alternative payment methods. In the penultimate paragraph of the letter, after the above instructions, it was also stated that "[t]his letter is for informational purposes only and does not require a response." (Id.) The last paragraph stated

> If your account is included in a bankruptcy proceeding, please forward a copy of this letter to your counsel and/or the trustee. Effective 12/01/2008, you may refer them to a Peak5 Customer

---

[3] The discrepancy between the date of the letter from Peak5 (December 5th) and the date of the closing of the sale to Capex (December 30th) is not resolved by the Portfolio Purchase Agreement, which states that "Buyer shall have no right to communicate with any Obligor or otherwise take any action with respect to any Receivable or any Obligor until the Closing Date." (Portfolio Purchase Agreement, § 2.2.) "Closing Date" is defined in the Portfolio Purchase Agreement as December 30, 2008.

4

Service Representative at 877-236-7672 and ask for the bankruptcy department. (Id.)

On December 23, 2008, counsel to the Debtor brought the current motion against E-Loan, Capex and Peak5, seeking to have the parties held in civil contempt and demanding $3,000 in damages, an unspecified amount of sanctions, and $6,600 in attorney's fees.[4] In response, counsel to Peak5 and Capex sent a letter to Debtor's counsel, dated January 26, 2009, in which they formally withdrew the letter of December 5, 2008, stating that it was sent to the recipient "in error" and that they would "endeavor" to avoid a "recurrence" of any similar action.

## DECISION

The Debtor has moved pursuant to §§ 727 and 105 of the Bankruptcy Code for a finding of civil contempt, damages, sanctions, and attorney's fees for the alleged violation of the discharge order in the Debtor's Chapter 7 case. Section 727 provides, in relevant part, that "a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter . . . ." 11 U.S.C. § 727(b). As the Court said in *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992), "The discharge of a debt pursuant to § 727 triggers the operation of § 524, which protects the debtor from any personal liability on the debt." Section 524 of the Bankruptcy Code provides:

> [a] discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . .

---

[4] Counsel to the Debtor originally claimed a violation of the automatic stay, but amended the motion on February 2, 2009 to allege a violation of the order of discharge.

5

11 U.S.C. § 524(a)(2).  Section 524 does not include an explicit enforcement mechanism, but § 105 of the Bankruptcy Code plainly provides the statutory authority, as the powers granted in that section "authorize the courts to 'issue any order, process, or judgment that is necessary or appropriate to carryout the provisions of this title.'" *In re Thompson*, 2007 Bankr. Lexis 2830, at *6 (Bankr. N.D.N.Y. Aug. 21, 2007), quoting 11 U.S.C. § 105.

There is no serious question that a violation of the discharge provided in § 524(a)(2) is punishable by contempt.  *See In re Cruz*, 254 B.R. 801, 816 (Bankr. S.D.N.Y. 2000), and cases cited therein.  For a finding of contempt, "the burden rests with the movant to show [by clear and convincing evidence] that the offending . . . entity had knowledge [actual or constructive] of the discharge and willfully violated it by continuing with the activity complained of."  *Torres v. Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007) (brackets in original) (internal citations omitted).  There the Court stated that "[c]ompensatory damages, in addition to coercive sanctions, may be awarded as a sanction for civil contempt if a party willfully violates a section 524(a)(2) injunction."  367 B.R. at 490 (internal citations omitted); *see also* 4 Collier on Bankruptcy ¶ 524.02[2][c] ("A creditor's actions in violation of the discharge injunction are willful if the creditor knows the discharge has been entered and intends the actions which violated the discharge injunction.").  Attorney's fees may also be awarded, if in addition to willfully disobeying the court order, the "party acts in bad faith, vexatiously, wantonly or for oppressive reasons."  *In re Dabrowski*, 257 B.R. 394, 416 (Bankr. S.D.N.Y. 2001); *see also In re Torres*, 367 B.R. at 490-91.

6

**Sale of Discharged Debts**

All three parties against whom relief is sought first raise the argument that their activities did not violate the discharge injunction. E-Loan argues that it merely sold the loan, that it did not contact or otherwise pressure the Debtor, and that the Debtor has not provided a basis for a finding that it (or any of the other parties) acted knowingly. Peak5 similarly opposes the motion on the basis that the Debtor cannot show it willfully attempted to collect a discharged debt. Capex joins in the arguments of Peak5.

There is substantial case law on the issue whether the purchase and sale of a discharged loan, leading to subsequent collection activity, can be a violation of the discharge injunction. In *In re Lafferty*, 229 B.R. 707 (Bankr. N.D. Ohio 1998), unsecured, non-priority debt held by a bank was discharged, and notice of such discharge was sent to the bank. The bank subsequently sold its debt portfolio, including the discharged debt, to a third party, which then filed a complaint in state court against the discharged debtor to collect the loan. The Bankruptcy Court held an evidentiary hearing, with the testimony focusing on the procedures employed by the bank to classify debts as discharged and whether the bank had knowledge of the vendee's intentions. In its ruling, the Court stated that the bank had a responsibility to register the discharge in its records and found that "[t]he selling of accounts is a deliberate act to collect on a discharged debt." *Id.* at 714, citing *Walker v. M&M Dodge, Inc. (In re Walker)*, 180 B.R. 834, 844 (Bankr. W.D. La. 1995). The Court found that the bank knew the third party would seek to collect the debt and that procedures adopted by the bank after the fact to identify debts that had been discharged did not prevent it from being held liable for historical deficiencies. *Id.*

Several other cases have similarly held that a creditor must maintain adequate procedures to prevent a violation of the discharge injunction. *See In re Roush*, 88 B.R. 163, 165 (Bankr. S.D. Ohio 1988) ("[T]he burden of establishing procedures adequate to minimize or eliminate this problem was upon the creditor."); *In re Conti*, 50 B.R. 142, 146 (Bankr. E.D. Va. 1985) ("The IRS is not privileged to ignore the dischargeability of certain taxes because of the burden or inconvenience which it may cause."). In *Gunter v. Kevin O'Brien & Associates Co. LPA (In re Gunter)*, 389 B.R. 67 (Bankr. S.D. Ohio 2008), the Court found that it is a violation of the discharge injunction for a creditor to turn over a discharged debt to a third party, such as an assignee or collection agent, without informing that party of the discharge. It said, "Otherwise the creditor and the collector could whipsaw the debtor, with the creditor denying liability on the basis that it had not itself taken any action against the debtor and the debt collector denying liability on the ground that it had no knowledge of the discharge." *Id.* at 73-74.

*Finnie v. First Union National Bank*, 275 B.R. 743 (E.D. Va. 2002), comes to a contrary conclusion. There a debtor's unsecured loan was discharged in a Chapter 7 case, and the bank received notice thereof. The debt was subsequently sold to a collection agency. The agency in turn sent a letter to the debtor demanding payment on the discharged loan. The District Court held that the bank's sale of the discharged debt to a collection agency did not violate § 524(a)(2) because that section is limited to "actions taken by a creditor to collect from the debtor" and did not specifically prohibit the sale of a discharged debt to a third party. *Id.* at 746. The Court rejected the *Lafferty* holding, arguing that the decision was motivated by the egregious actions taken by the creditors there and contrary to the "plain language" of the statute. *See id.* at 746, n. 3.

8

This Court finds *Finnie* to be an overly restrictive construction of § 524(a)(2). When interpreting a statute, a court's "obligation is to look to the plain language of the statute to effectuate the intent of Congress." *W.R. Grace & Co. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir. 2009), citing *NRDC v. Abraham*, 355 F.3d 179, 198 (2d Cir. 2004). This requires interpreting "'the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative history.'" *NRDC*, 355 F.3d at 198, quoting *General Motors Corp. v. National Highway Traffic Safety Admin.*, 898 F.2d 165, 170 (D.C. 1990); *see also In re Lippman*, 122 B.R. 206, 211 (Bankr. S.D.N.Y. 1990). "'[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Dole v. United Steelworkers of America*, 494 U.S. 26, 35 (1990), quoting *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989); see also *Kelly v. Robinson*, 479 U.S. 36, 43 (1986); *Bank of Marin v. England*, 385 U.S. 99, 103 (1966).

The purpose of § 524 of the Bankruptcy Code is to prevent a debtor from being pursued for the payment of his or her discharged debts. The discharge order "is intended to preclude virtually all actions by a creditor to collect personally from the debtor." Norton, Bankruptcy Law & Practice 2d, ¶ 48.2 at 48-5 (1997); *see also Walker v. Wilde (In re Walker)*, 927 F.2d 1138, 1142 (10th Cir. 1991); *In re Andrus*, 189 B.R. 413 (N.D. Ill. 1995). Only through enforcement of the discharge order can the discharge provided by the Bankruptcy Code provide the debtor with a "fresh start," a concept central to the bankruptcy laws. *See Green v. Welsh*, 956 F.2d at 33. As the Supreme Court stated with respect to the prior Bankruptcy Act,

> One of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and

9

> permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes . . . This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt . . . The various provisions of the bankruptcy act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244-245 (1934) (internal citations omitted). Were § 524 to be applied as narrowly as the Respondents argue, no debtor could be free from harassment post-discharge. To avoid violation of the discharge injunction, a creditor could simply collect on a discharged debt indirectly by selling it to a third party, aware that the third party intended to pursue collection of the debt. The third party could then plead ignorance of the discharge, thereby purporting to insulate all parties from liability. *See In re Gunter*, 389 B.R. at 74. The Respondents are not entitled to summary rejection of the Motion.

**<u>Intent and Willfulness</u>**

In order for there to be a finding of contempt for the violation of § 524, a person must act willfully and with knowledge. *See In re Torres*, 367 B.R. at 490. The Court makes no finding that the Respondents acted with intent or knowledge, which are issues to be determined in a subsequent hearing. Nevertheless, it bears noting that the Debtor has shown enough to state a *prima facie* case. As to E-Loan, it clearly had prior knowledge of the discharge, not only through the notice of discharge it received but also through its subsequent entry into a settlement with the Debtor. Indeed, having paid $4,000 to the Debtor in a prior settlement on a motion for contempt, one would think that

10

E-Loan would not have treated his discharged debt cavalierly. Whether it did or not, and whether it had appropriate procedures in place, are issues for a subsequent hearing.

Counsel to Capex and Peak5 also argued at the hearing that they had "no knowledge" the debt was discharged. Capex and Peak5 will also have an opportunity to show that they did not know that the Debtor's loan had been discharged and that their violation of the injunction was not willful. However, actual or constructive knowledge of the discharged debt will suffice to find a party in violation of the discharge injunction. *See In re Torres*, 367 B.R. at 490. The correspondence that Capex and Peak5 sent to the Debtor is itself sufficient to establish that they knew that the debt might have been "included in a bankruptcy proceeding," as they provided a special number to call if it had been.[5] They obviously made no effort to exclude bankruptcy-related debts from the purchase and sale agreement.

Moreover, the documents signed in connection with the sale of the loan portfolio to Capex contain provisions that suggest Capex had notice that many loans were discharged. For instance, the Portfolio Purchase Agreement between E-Loan and Capex provides that "[t]he Seller . . . will provide to the Buyer Receivable Documents for those Receivables within the possession of the Servicer within thirty (30) days of the Closing Date." (Purchase Agmt., § 3.2.) The definition of "Receivable Document(s)" includes "any other documents that may be commercially reasonably requested by CEA, *including any information related to any judgments or bankruptcy filings* related to the assets that the Seller has in its possession." (Purchase Agmt. § 1) (emphasis added.) Additionally, the Portfolio Purchase Agreement states that "[t]he Seller shall deliver to Buyer, on the

---

[5] The record, of course, does not show what would have happened if the Debtor or his lawyer had made a telephone call to the number provided. Respondents will have an opportunity to show what procedures were in place in connection with such calls.

11

Closing Date, an up-to-date Computer File." (Purchase Agmt., § 2.3.) "Computer File" is defined as "that certain computer file or files, to be provided by the Seller to Buyer on or prior to the Closing Date, setting forth all relevant information on the Receivables and the Obligor(s), including . . . other information identified herein on Exhibit E." Exhibit E to the Portfolio Purchase Agreement is a list of "Computer File Data Fields" and includes listings for "bk flag" and "bk_chapter." These codes appear to refer to bankruptcy information regarding the debts being sold. The Court will provide the parties with a full opportunity to explain the documents already submitted and to submit additional evidence on the information that Capex and Peak5 had with respect to the Debtor's discharged debt.

**"Voluntary" Repayment**

It is recognized that § 524(f) of the Bankruptcy Code provides, "Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt." 11 U.S.C. § 524(f). Respondents will also have an opportunity to explain the circumstances regarding the sale of the Debtor's claim and why this Debtor might have voluntarily repaid the discharged loan for the subject vehicle, where he had recently paid the Chapter 7 trustee $5,400 for the equity in the same car. One commentator has called the "purchase of claims in a consumer chapter 7 case . . . a potential minefield . . . " Moss, *The Risks of Purchasing and Collecting Consumer Debt*, 10 Am. Bankr. Inst. L. Rev. 643, 643 (2002). The author identifies four possible ways the buyer of a discharged debt can legitimately attempt to realize on the "debt."

> If the aim of the buyer is to realize on the upside potential of the claim based solely on the ultimate dividend payable from the estate, the prospects appear marginal. If, instead, the buyer's aim is to realize on all or a significant part of the entire claim by attacking the debtor's discharge

> or the dischargeability of the claim purchased by taking advantage of the debt reaffirmation provisions of the Bankruptcy Code, or by inducing voluntary payments after the discharge enters, the prospects are at best uncertain, in many respects fraught with risk, and, of course, subject to the potential costs of litigation.

*Id.* at 643. In the instant case Respondents could not have obtained a dividend in the Debtor's Chapter 7 case because it was too late to file a claim. They could not have attacked the discharge or the dischargeability of the debt or used the reaffirmation provisions of the Code, as it was also too late to do so. Their only recourse was to induce a voluntary repayment.

Whether it is possible to "induce" a "voluntary" repayment, however, is highly questionable. Courts have found that a party may violate the discharge injunction by actions that are designed to induce the repayment of a discharged debt and that negate a finding of voluntariness. *See Arnold v. Stevenson Federal Credit Union (In re Arnold)*, 206 B.R. 560, 567 (Bankr. N.D. Ala. 1997). One court has concluded that voluntariness must be analyzed objectively "as referring to repayment that is free from creditor influence or inducement." *Hudson v. Central Bank (In re Hudson)*, 168 B.R. 368, 371-72 (Bankr. S.D. Ill. 1994). As the Court said in *Van Meter v. American State Bank*, 89 B.R. 32 (W.D. Ar. 1988), "[T]he provisions of § 524(f) do not validate repayments of discharged debts that are in any manner induced by the acts of the creditor." *Id.* at 34. In any event, Respondents will have an opportunity to submit evidence on the issue of voluntariness at the subsequent hearing.

**Language of the Letter**

Nevertheless, one defense raised by Respondents can be rejected at this point. Respondents argue that the letter sent to the Debtor cannot support a finding of

13

sanctionable conduct and that it precludes the Debtor from showing a knowing and willful violation of the discharge order.  They assert that the letter did not demand that the Debtor make a payment and requested only that a recipient who was or had been in bankruptcy forward the letter to legal counsel.  E-Loan, in fact, contends that the letter was "an ordinary 'welcome' letter to a customer, required by law after a transfer of an obligation . . . ."  (E-Loan Opp., ¶ 3.)

The Court is constrained to ask, "welcome" to what?  In E-Loan's surreal view of the world, it appears that the Debtor, whose debt had been discharged, was still a "customer" -- indeed, an "ordinary" customer entitled to a "welcome".  Although Respondents will have a full opportunity to explain the purpose of the "welcome" letter, its wording certainly does not justify a finding that it was not intended to induce a loan repayment.

Thus, the letter stated that Peak5 would begin billing the Debtor as of December 1, 2008 and if the Debtor did not receive a statement, he should mail a payment to Peak5.  The letter provided detailed instructions for three alternative payment methods, including through bill payment service with a bank or credit counselor, MoneyGram, or an automatic payment program.  While the letter did eventually state (penultimate paragraph) that it was for "informational purposes" and did not require a response, this language is vague and could easily be interpreted to mean that the recipient did not have to acknowledge receipt of the letter but remained obligated to make a payment.  The last paragraph of the letter also directed those in bankruptcy to have counsel or the trustee contact the company, but it is wholly ambiguous.  It does not explicitly state that an individual who is currently or who was in bankruptcy need *not* make a payment.  On its

14

face the letter appears designed to collect a debt and to be designed to encourage an uneducated recipient to make a payment.

The strictures of § 524 of the Bankruptcy Code extend beyond legal proceedings and traditional collection activities and encompass "any act to collect a discharged debt as a personal liability of the debtor." *In re Torres*, 367 B.R. at 484. The injunction is broad and covers "all forms of collection activity, including letters, phone calls, threats of criminal proceedings or other adverse actions intended to bring about repayment." 4 Collier on Bankruptcy, ¶ 524.02[2] (15th ed. 2008). The legislative history states that

> [t]he injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts . . . [O]nce a debt is discharged, the debtor will not be pressured in any way to repay it. In effect the discharge extinguishes the debt, and creditors may not attempt to avoid that.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 365-66 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 80 (1978). It has been found that the mailing of a mortgage loan statement that refers the Debtor to payment coupons for the "current due date" is a violation of the discharge injunction, despite the inclusion of language that the statement was not a demand for payment. *See In re Bruce*, 2000 WL 33673773, at *3 (Bankr. M.D. N.C. Nov. 7, 2000). Similarly, in the recent case of *In re Harlan*, 402 B.R. 703 (Bankr. W.D.Va. 2009), the Court overruled the defendant's motion to dismiss a claim for violation of the discharge injunction, despite the defendant's argument that it was only attempting to enforce its *in rem* rights as a secured creditor and that the letter sent to the debtor stated, "If you received a bankruptcy discharge that included this debt, this notice is not intended and does not constitute an attempt to collect a debt against you personally

15

. . . ." *Id.* at 716.  In sum, the wording of the letter does not immunize Respondents from liability for a violation of § 524.

**"Technical" Violations of the Discharge Injunction**

Respondents finally argue that they should not be found in contempt for a "technical" violation of the discharge injunction.  E-Loan calls the matter "trifling."  (E-Loan Opp., ¶ 3.)  Capex and Peak5 cite *In re Dabrowski*, 257 B.R. at 416, for the proposition that a "technical or unintended" violation of the discharge injunction is not actionable.

As stated above, a further hearing is required at which Respondents will have a full opportunity to demonstrate that they did not act with intent or knowledge.  On the other hand, the instant record certainly does not support the claim that Respondents' actions were "technical" or "trifling."  There is evidence of substantial trading in the discharged debt of Chapter 7 debtors.[6]  The New York courts have been inundated in recent years with default judgments on consumer loans, many of which have apparently involved discharged debt.[7]  The issues raised by this Motion are accordingly important.  At the further hearing, a full record can be made as to the amount of discharged debt

---

[6] An industry has arisen in the trading of Chapter 13 and Chapter 7 debt. "Although institutional and trade creditor debt are most commonly perceived as the subject of claims trading, even Chapter 13 consumer debts and Chapter 7 debts have become the targets of investors." Business Workouts Manual § 25:1 (September 2008). It has been alleged that the acquisition of such debt on a large scale can be lucrative, with parties purchasing and selling discharged debt for pennies on the dollar, often with the hope that such debtors will in turn repay pennies on the dollar of those discharged debts. *See* Karen Gross, *As We Fleece Our Debtors*, 102 Dick. L. Rev. 747, 751-52 (Summer 1998); *see also* Robert Berner and Brian Grow, *Prisoners of Debt*, Business Week, Nov. 12, 2007, at 44.

[7] "Debt and collection efforts are on the rise with 80% of these cases reportedly resulting in default judgments. A recent report found that in 2006, approximately 320,000 consumer debt cases were filed in New York City Civil Court, constituting over 50% of the Court's docket." NYC Dept. of Consumer Affairs' Comments to Docket ID OCC-2007-0015 (Nov. 2007), http://www.nyc.gov/html/ofe/downloads/pdf/Letter_to_OCC.pdf, citing the study results of Urban Justice Center, *Debt Weight: the Consumer Credit Crisis in New York City and its Impact on the Working Poor*, Oct. 2007, p. 1, 13. *See also* New York City Bar, Report by the Civil Court and Consumer Affairs Committees in Support of Intro. 0660-2007, January 21, 2009, http://www.nycbar.org/pdf/report/Consumer_Debt.pdf, citing same.

16

included in the Portfolio Purchase Agreement and Respondents' practices with respect thereto. Such evidence would be required, in any event, on the issue of sanctions.

**Sanctions**

In his moving papers, the Debtor argues that he is entitled to sanctions in the form of damages, attorney's fees and court costs. It is stated that the Debtor "has suffered damages in at least the amount of $3000.00", but the Motion does not elaborate on the type or source of these damages. (Aff. of Debtor's Atty. ¶ 16.) It is not clear whether punitive damages are sought as part of the sanctions.[8] Additionally, it is stated that the Debtor "will have incurred an attorney's fee in the amount of $6,600.00 in pursuing this Motion which would have been unnecessary had E-Loan, Inc., respected the Discharge Order of which it had notice. Such fee would also have been unnecessary if Capex Acquisitions, LLC and Flatiron Financial Services, Inc., doing business as Peak5, had respected the Discharge Order." (Id. at ¶ 17.) A brief statement as to the attorney's qualifications and the reasonableness of his fees is included, and a copy of the time records for the attorney's fees is attached.

The Respondents correctly argue that the Debtor has not met his burden with respect to the request for damages. As the Court made clear at the prior hearing, held on February 26, 2009, the affidavit submitted on the part of the Debtor's attorney is insufficient on the issue of the Debtor's damages, and evidence has to be taken on that point. The reasonableness of the attorney's fees claimed also can only be assessed after the subsequent hearing.

---

[8] Some courts have found that punitive damages can be awarded for a violation of the discharge injunction if the respondent's actions are sufficiently egregious. *See In re DiGeronimo*, 354 B.R. 625, 644 (Bankr. E.D.N.Y. 2006); *In re Watkins*, 240 B.R. 668, 681 (Bankr. E.D.N.Y. 1999). No determination is made whether such damages are available, however, and this issue is reserved for the further hearing.

17

**Procedural Objections**

E-Loan also raises a procedural objection to the steps followed by the Debtor in seeking relief, arguing that Bankruptcy Rule 7001 requires an adversary proceeding to be filed because the Debtor is seeking relief relating to "a proceeding to recover money or property" or a "proceeding to obtain an injunction." Fed. R. Bankr. P. 7001(1), (7). This is not correct. "[A] debtor may enforce a discharge under 11. U.S.C. § 524 by means of a contempt motion." *Texaco v. Sanders (In re Texaco Inc.)*, 182 B.R. 937, 945-46 (Bankr. S.D.N.Y. 1985); s*ee also In re Weichmann*, 2001 Bankr. Lexis 1797, at *3 (Bankr. N.D. Ill. Oct. 30, 2001) (holding that "a contempt order is the appropriate remedy for violations under § 524(a)(2), and that any monetary relief awardable is in the form of sanctions, rather than damages."); *In re Bock*, 297 B.R. 22, 28 (Bankr. W.D.N.C. 2001) (same). This is consistent with the principle that it is unnecessary to proceed by way of adversary proceeding when requesting sanctions accompanied by damages for violation of the automatic stay under § 362 of the Bankruptcy Code. *See In re Hooker Investments, Inc.*, 116 B.R. 375, 378 (Bankr. S.D.N.Y. 1990).

**Conclusion**

For the foregoing reasons, an evidentiary hearing is necessary to establish whether the Respondents should be held in contempt, and if so, to determine the issues of sanctions, damages and attorney's fees.  The parties are directed to arrange an appropriate hearing date with Chambers.

**IT IS SO ORDERED.**

Dated: New York, New York
June 5, 2009

*/s/ Allan L. Gropper*
UNITED STATES BANKRUPTCY JUDGE